**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

| | | |
|---|---|---|
| THE STATE OF NEW MEXICO, ex rel. | § | |
| HECTOR BALDERAS, | § | |
| ATTORNEY GENERAL, | § | |
| | § | |
| Plaintiff, | § | No.: 2:20-cv-01355-KG-KRS |
| | § | |
| v. | § | |
| | § | |
| STERIGENICS U.S., LLC, SOTERA | § | |
| HEALTH HOLDINGS, LLC, SOTERA | § | |
| HEALTH LLC, and SOTERA HEALTH | § | |
| COMPANY, | § | |
| | § | |
| Defendants. | § | |

**NEW MEXICO'S REPLY IN FURTHER SUPPORT OF EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

The State of New Mexico (the "State") respectfully submits this reply in further support of its *Emergency Motion in Support of Request for Temporary Restraining Order and Preliminary Injunction* [Dkt. 1-4, 12] ("Emergency Motion").

## INTRODUCTION

Defendants' untimely *Brief in Opposition to Plaintiff's Emergency Motion for Temporary Restraining Order and Preliminary Injunction* [Dkt. 31] ("Opp.") is too little, too late.  Briefing has closed on the Motion.  *See* Dkts. 24 (*Notice of Completion of Briefing*), 28 (*Response to Motion for Clarification*).  As explained in those filings, following Defendants' improper removal of this action, the Emergency Motion was pending in this Court, but no opposition was filed until well after the time prescribed by the Local Rules had passed.  Indeed, no response was filed until February 24, 2021—**64 days** since the Emergency Motion was originally filed and **47 days** since the Errata correcting the omitted signature was filed.  Now, having had the law clarified for them in the State's response to their *Motion for Clarification*, Defendants wish to oppose the Emergency Motion.  In support, they marshal various FDA and EPA commentaries (which they repeatedly mischaracterize) and the self-serving *ipse dixit* of an employee with a direct interest in defending the company's problematic practices.  *See* Dkt. 31-1 through 31-16 (Exhibits A-P).

These materials, and the faulty legal arguments accompanying them, are plainly insufficient to warrant denial of the Emergency Motion.  The fact remains, as it has since the day this case was filed, that Santa Teresa residents and workers are being exposed to potentially dangerous concentrations of carcinogenic ethylene oxide ("EtO") due principally to Defendants' tortious subversion of environmental controls in place at the Santa Teresa Plant (the "Plant").  An injunction directing Defendants to immediately terminate any processes or practices resulting in uncontrolled emissions of EtO from the Plant is necessary to protect the public health.

## ARGUMENT

### I.    The State Has Standing To Seek Injunctive Relief.

Defendants argue that the State lacks standing to seek an injunction because the requested injunction would not prevent the harm alleged, contending that the State's sole support is the EPA NATA study's finding that residents near the Plant suffer a statistically significantly increased cancer risk due to Defendants' emissions. Opp. at 14. While that study certainly supports the State's position that Defendants' operations pose a public health threat, it is coupled with other critical facts Defendants do not even acknowledge. For example, the State conducted sampling of ambient outdoor air at the Plant and in Santa Teresa more broadly, and its findings confirm that the concentrations of EtO residents are breathing far exceed what EPA and other scientific and regulatory authorities consider safe under the only existing risk-based EtO inhalation standard (the cancer inhalation unit risk metric, or "IUR"). These elevated concentrations—among the highest in the nation, based on available data—cannot be explained solely by the fully and properly controlled use of EtO at the Plant. And indeed, the State's investigation produced evidence that Defendants have implemented practices designed to bypass emissions controls at the Plant. Compl., ¶¶ 118-126. Paired with this evidence, these sampling data indicate that it is Defendants' subversion of environmental controls that accounts for the elevated readings set forth in the Complaint. There is simply no other plausible explanation.

All Defendants can do is point to a confederacy of everyday objects as potential sources of EtO (such as lawnmowers and grills). *See* Opp. Ex. E. But there is no evidence, or any credible reason to believe, that these comparably miniscule and temporary point-sources, rather than Defendants' large, stationary, constantly active industrial facility, account for the elevated EtO concentrations reported in the Complaint. Defendants' Ex. E is not even a study or analysis, but a

context-free summary of data of dubious relevance that says nothing about EtO concentrations in Santa Teresa. Ex. E fails to explain how its measurements were taken, what the prevalence of these objects in the Santa Teresa area is, and what impact such purported emissions may have on total levels of EtO in ambient outdoor air. Defendants' Ex. E purports only to present a "Worst Case" scenario for short, temporary bursts of EtO emissions from small objects. In short, Defendants offer mere junk science that fails to inform this Court's analysis in any meaningful way.

The requested injunction would immediately terminate uncontrolled EtO emissions from the Plant, materially reducing the ambient EtO concentrations in the community. Although some background level of EtO may persist, and lawnmowers will continue to mow, it is reasonable to expect that this level would fall below the IUR. And that is the State's goal: to protect Santa Teresans and other New Mexicans from being exposed to potentially dangerous EtO concentrations. Accordingly, the State has standing to pursue this relief.

## II.     The Primary Jurisdiction Doctrine Is Inapplicable

The primary jurisdiction doctrine calls for courts to stay actions where the issues presented deviate from those traditionally handled by courts, and a regulatory agency is uniquely competent to address them. The doctrine has no application where, as here, a court may competently resolve the dispute. *See Marshall v. El Paso Nat. Gas. Co.,* 874 F.2d 1373, 1376-77 (10th Cir. 1989). The doctrine similarly has no application where, as here, no agency has jurisdiction over the issues in the first place. *See State ex rel. ENMU Regents v. Baca*, 189 P.3d 663, 667 n.1 (N.M. 2008) (noting that doctrine arises only when court and agency have concurrent jurisdiction).

Although Defendants allege that EtO itself is on trial in this case, and that the State's case is really about "regulating" their use of the chemical, in fact, this case focuses on Defendants'

3

tortious conduct in subverting the controls in place at the Plant. The State does not allege that Defendants' controls fall short of regulatory requirements; instead, the State alleges that Defendants have acted to diminish or undermine the effectiveness of those controls, or bypass them entirely, in violation of their common-law duties to the State and the public. The issues that must be resolved in this case fall squarely within the traditional scope of judicial competence as "[t]he determination of whether [defendant's tortious] acts caused [environmental] pollution is not a determination outside of the conventional knowledge of the judge and jury." *Marshall,* 874 F.2d at 1378. This is a tort case, pure and simple, and one that this Court and a lay jury is capable of understanding and addressing. *See Elmer v. S.H. Bell Co.*, 127 F. Supp. 3d 812, 819-20 (N.D. Ohio 2015) (allowing tort claims of nuisance, trespass and negligence to proceed to redress harms to plaintiffs from defendants' emission of toxic chemicals and rejecting defendants' claims that state torts were subject to primary jurisdiction of EPA and state agency).

Even assuming primary jurisdiction could be invoked here (and it cannot), Defendants fail to satisfy the applicable legal standards. *See* Opp. at 15 (citing *Schwartzman, Inc. v. Atchison, Topeka & Santa Fe Ry. Co.,* 857 F. Supp. 838, 841 (D.N.M. 1994) (describing the factors to consider)). As an initial matter, the Court is not being asked to decide factual issues outside of the conventional experience of courts; thus, that core factor is not satisfied.

Next, Defendants hypothesize that they may be subjected to conflicting orders if this case is not derailed under the primary jurisdiction doctrine because EPA is purportedly "considering" whether to act with respect to uncontrolled EtO emissions. Opp. at 16-17. But Defendants plainly admit that EPA in fact **does not** regulate uncontrolled EtO emissions. Opp. at 2 (acknowledging "the fact that the EPA and the NMED … do not require" limiting uncontrolled EtO emissions). Defendants' speculation that EPA may at some time in the future impose limits on uncontrolled

EtO emissions is far from sufficient to invoke the primary jurisdiction doctrine. Defendants must show that the EPA has concurrent jurisdiction over this case right now, *Baca*, 189 P.3d at 667 n.1, and they admit they cannot do so. More to the point, this admission demonstrates Defendants' failure to satisfy three separate factors under the primary jurisdiction test. First, it shows the lack of any conflicting agency orders. Second, it demonstrates the lack of any parallel action by relevant agencies. Third, it demonstrates that agency action has in fact languished, in the end *necessitating* judicial intervention.

Finally, the requested injunctive relief here (halting conduct that results in the continued uncontrolled emissions of EtO) does not require "scientific or technical expertise." *See* Opp. at 11-12 (describing the conduct resulting in alleged uncontrolled releases of EtO that the State seeks to enjoin). There can be no serious argument that a determination of whether Defendants have and continue to allow for the uncontrolled release of EtO by, *e.g.*, allowing it to escape from sterilizer chambers and aeration rooms and intentionally exhausting it through uncontrolled means, or failing to properly store and handle the gas, requires arcane expertise that is better suited for agency resolution or that is beyond the competency of this Court. For all these reasons, primary jurisdiction has no application here.

    **III.    The State Is Entitled To The Requested Injunction**

        **A.  The evidence supports the State's allegations.**

The State's Complaint and Emergency Motion establish that Defendants have engaged in conduct resulting in harm and risk of harm to New Mexico residents. Those detailed allegations include analytical results from State air monitoring in Santa Teresa (including just outside the Plant) showing potentially hazardous levels of EtO far above background, *see* Compl. ¶ 31, and witness statements from former Plant employees explaining how Defendants intentionally used

large facility doors and shipping bays to introduce EtO into the community when the air inside the Plant became too rich in the toxin (again due to lax procedures). *See* Compl., ¶¶ 118-126. In response, Defendants submit a statement from the Plant's General Manager, Steve Ortiz, in which Mr. Ortiz offers conclusory testimony at odds with the facts. Mr. Ortiz's general denial is undermined by the specific facts set forth in the Complaint.

The State now also offers the declaration of former Plant employee Michael Lucero, who provides a first-hand account of the kind of misconduct described in the Complaint. *See* **Ex. A,** Declaration of Michael Lucero. Mr. Lucero explains precisely how Defendants undermined their EtO air monitoring system and intentionally caused the built-up EtO to waft into the ambient outdoor air. *See, e.g., id,* ¶ 10 ("The warehouse doors were frequently left open. This occurred as a means to ventilate the warehouse and allow ethylene oxide to waft out into the atmosphere, so that the warning lights [installed to monitor EtO buildup] would return to green. . . . Sometimes, the workers left the doors open all day long on hot summer days."). The practices described by Mr. Lucero in his declaration were not new or unknown to Defendants. For example, litigation against Sterigenics in Illinois involving similar misconduct saw the filing of several affidavits from former employees in which they describe the practice of leaving chamber and aeration room doors open, allowing for elevated levels of EtO to build up inside the warehouse, which triggered warning lights, and that exterior doors were then opened because they were told that "cold air dissipates ethylene oxide." *See* **Ex. B**, Declaration of Christopher Giardini. An affidavit submitted by another employee noted "consistently elevated levels of ethylene oxide in the [Illinois] facility" and that doors were left open because "[m]uch of the ethylene oxide in the facility would literally go out the door and into the environment . . . and the ethylene oxide in the facility **was not subject to any pollution control or filter system.**" *See* **Ex. C**, Declaration of Patrick John Sullivan

6

(emphasis added).  These additional accounts of misconduct demonstrate that Defendants have engaged in a broad pattern of abuse at their sterilization facilities and that Mr. Lucero's experience in Santa Teresa was not unusual but part of a systematic company-led effort to bypass environmental controls.  As described in the Complaint, Emergency Motion, and Lucero Decl., the State's evidence, including forensic environmental data and first-hand witness accounts, shows that this same conduct has and is occurring at the Plant, resulting in significant unregulated, uncontrolled emissions of EtO that requires immediate judicial intervention.

## B.  An injunction is necessary to prevent irreparable harm.

Defendants' arguments regarding irreparable harm are without merit.  These arguments, much like those made regarding the State's standing, mischaracterize the State's claims and the harms it seeks to enjoin.  Moreover, Defendants' argument is premised on their unsupported view that the EPA's IUR and the Integrated Risk Information System ("IRIS") evaluation of the health risk posed by EtO (which was incorporated in the NATA), is somehow invalid.  *See* Opp. at 8-11, 19-20.[1]  This is fundamentally wrong.  Despite Defendants' criticisms of the science—criticisms that truly are out of place in a court, unlike the State's claims here—the IUR is and remains ***the only health standard in place*** regarding EtO inhalation exposure, whether Defendants like it or not.  The reason is that it represents the best available scientific evidence concerning the true risks of EtO inhalation.[2]  When the IUR was adopted by the EPA, it was reviewed by agency and non-

---

[1] To be clear, the State's action is not about the use or efficacy of EtO as a sterilization agent.  The use of EtO in general is not at issue and Defendants' protestations about the impact on the provision of sterilized medical products is a red herring.  *See* Complaint ¶ 106 (noting FDA's position that EtO sterilizers must comply with EtO standards and guidelines).  Instead, the lawsuit is about Defendants' willingness to jeopardize public health—including the health of Santa Teresans—by intentionally, recklessly, or negligently causing the Plant's emissions control systems to be subverted.  While the safe, fully and properly controlled use of EtO may be important to ensuring an adequate supply of sanitized medical devices and equipment, Defendants' alleged conduct of uncontrolled emissions only threatens the health and safety of New Mexicans.  To that end, the State's request for injunctive relief does not include a shutdown order; it merely seeks to end Defendants' uncontrolled EtO emissions.

[2] With regard to the Texas Commission on Environmental Quality criticisms of the IUR, cited by Defendants, Opp. at 9, those concerns represent one particular state's position, which is contrary to the careful process and conclusions reached by EPA in deciding the proper risk value for EtO.  In addition, the one state that has set its own state-based

agency experts and subjected to extensive public comment, including from the chemical industry.[3] The IRIS assessment took 10 years to complete, including interagency review, external review, Science Advisory Board review, and multiple opportunities for industry and the public to comment. All industry and public comments were considered by the EPA, including various criticisms such as those raised by Defendants now, yet the IUR was adopted. Additionally, the IRIS study results were published in an independent, peer-reviewed scientific journal. Defendants may wish for self-interested reasons that the standard was less protective, but their wish doesn't make it so.

Defendants' disagreement with a risk standard that applies to their conduct does not mean that its application is any less valid.[4] More importantly, the IUR and the underlying IRIS assessment are based on sound science.[5] The standard was established by the EPA to assess the risks associated with lifetime exposure to EtO **by inhalation**, including the risk of cancer and other significant health risks. Defendants' position that the IUR is unreasonably restrictive rests on the

---

levels for EtO, Michigan, reviewed the EPA analysis and concluded that "EPA's assessment was thorough and rational, followed a weight-of-evidence approach, and utilized the best available science, and that the EPA assessment underwent a rigorous public and peer review process prior to finalization. " *See* **Ex. D**, Michigan Department of Environmental Quality, Response to Public Comments for Ethylene Oxide, at 12 (July 31, 2017). Ultimately, Michigan considered the same criticisms raised here and set *even stricter* air quality limits for EtO, all while defending the methodology and determination of EPA IRIS risk estimates and guidance. *See generally id.*

[3] *See* **Ex. E**, EPA, Executive Summary, Evaluation of the Inhalation Carcinogenicity of Ethylene Oxide, 2016 (hereinafter "EPA Evaluation").

[4] Defendants cite to studies purporting to show that the IUR is below levels naturally produced within the human body, represents levels that are "orders of magnitude below the concertation in everyday ambient air" or is lower than certain occupation exposure levels. Opp. at 8-9, nn. 7-9 (citing Exhibits B-G). These criticisms are misplaced. First, the EPA Evaluation appropriately addressed the background levels in the body as part of its assessment of the proper protective values. EPA Evaluation at 3-4. The IUR concerns **inhalation** risk. Second, the actual alleged EtO concentrations detected in the ambient outdoor air as measured by the State in the immediate vicinity of the Plant and downwind from its operations include levels as high as 2.88 ug/m³, which are **four to ten times** higher than the background average ambient levels of EtO that Defendants cite. These levels point to the Plant as the significant local source of EtO. Finally, Defendants' arguments about occupational exposure limits are irrelevant to the IUR. There can be no meaningful direct comparison between the IUR and OSHA standards, since they are based on incompatible time frames (8-hour exposure for OSHA, lifetime for IUR). Additionally, the OSHA standard is not a risk measure designed to protect public health regarding EtO exposure but represents a threshold level for increased compliance. Similar incompatibilities exist when considering European occupational limits.

[5] *See* **Ex. F**, Excerpts of Agency for Toxic Substances & Disease Registry ("ATSDR"), *Draft Toxicological Profile for Ethylene Oxide*, at 67-68 (Sept. 2020) (available in full at https://www.atsdr.cdc.gov/toxprofiles/tp137.pdf) (reaffirming the 2016 EPA cancer risk value issued under IRIS as the best available science).

flawed assumption that it pertains to any EtO source, including EtO that may be generated in metabolization, when in fact, the IUR relates solely to **inhalation-route exposures**. This clarification reveals that Defendants' objections to the IUR—which are wholly out of place, given that the standard cannot be changed in this litigation—are meritless.

Despite the State's clear allegations of irreparable harm, Defendants argue in the alternative that injunctive relief prohibiting the uncontrolled release of EtO will not have an impact because existing controlled emissions of EtO would continue, and thus there is no irreparable injury. Opp. at 20. But in fact, the Complaint and Emergency Motion seek to enjoin the uncontrolled release of EtO from the Plant in order to lessen or reduce the overall risk of ongoing exposure to EtO from Defendants' operations, *i.e.*, to bring the ambient EtO concentration below the IUR. Defendants' argument treats risk as a simple, static concept (risky or not-risky), but at issue here is a complex public health risk created and exacerbated by uncontrolled and unnecessary EtO emissions that can be stopped. Any reduction in Defendants' unlawful uncontrolled emissions will reduce the overall amounts of EtO in the ambient air in Santa Teresa and thereby reduce the overall health risks.

### C.    An injunction would serve the public interest.

Defendants' focus on the impact of any injunctive relief on the Plant's ability to engage in essential EtO sterilizations is a diversion from the actual misconduct alleged by the State. Any government entity with an interest in seeing Defendants' sterilization operations succeed (including the State) expects that Defendants will provide those services *in compliance with all applicable laws* in order to protect the health and safety of nearby communities. *See, e.g.*, Opp. Ex. A (FDA Statement acknowledging that FDA is "committed to working with manufacturers to look for alternative sterilization options" and "share[s] the public's objective to reduce over-

reliance on ethylene oxide for medical device sterilization" and has been "addressing the broader need for innovation and improvements to medical device sterilization techniques in general"). To the extent Defendants' practices violate applicable laws, as the State alleges here, the Defendants are not excused for that conduct on the grounds that the work they are doing is important. Defendants must comply with law—full stop. The State will not permit Defendants to sacrifice the health of New Mexicans. The inconvenience or cost to Defendants to address their misconduct resulting in ongoing uncontrolled emission of EtO and the increased risk of negative health impacts is a small price to pay and is not adverse to the public interest.

### D. The State is likely to succeed on the merits.

As set forth in the Emergency Motion, the State is likely to succeed on the merits of its claim. Defendant argue that the State will not prevail because their conduct was permitted activity. At its most basic level, this argument conflates the concepts of fully controlled, permitted EtO emissions (which the State does not seek to enjoin) and uncontrolled, unpermitted EtO emissions (which are the subject of the requested injunctive relief). In fact, New Mexico's claims do not rely on Defendants' exceedance of quantitative emissions limits, but on Defendants' tortious conduct in causing unreasonably dangerous EtO concentrations to accumulate in the Santa Teresa area due to the practice of, *e.g.,* causing **unreported, uncontrolled** releases of EtO as a result of their intentional or negligent subversion of environmental controls. Compl. ¶ 19; *see id.* at ¶ 19(a)-(c) (describing various ways in which Defendants tortiously sought to evade applicable environmental controls); *id.* at ¶¶ 118-124 (detailing statements from former employees regarding Defendants' tortious conduct in evading or ignoring environmental controls); *id.* at ¶ 20 (describing "uncontrolled" (i.e. unpermitted or unregulated) emissions that escaped from the Plant's back vents); *id.* at ¶ 117 (same).

In any event, even if the uncontrolled EtO emissions were a permitted activity—which they decidedly are not—whether or not the terms and conditions of any permit have been violated would not prove or disprove the merit of any claims asserted here.  The acquisition of an air quality permit, and compliance with its terms, does not excuse noncompliance with other state laws, including the common law duties that the State alleges Defendants violated.  *See* N.M.A.C. 20.2.72.209 ("The issuance of a permit does not relieve any person from civil or criminal liability for failure to comply with the provisions of the Air Quality Control Act, the federal act, federal regulations thereunder, any applicable regulations of the board, and **any other applicable law or regulation**." (emphasis added)).  Moreover, as described above, New Mexico's claims focus on conduct, such as efforts to bypass whatever environmental controls Defendants had put in place, that lies far afield from any permitted operations.  Thus, whether the controls that do exist meet permit standards is not a core, disputed issue in this case; the question is whether Defendants' actual practices constitute violations of their duties.  As to that question, the State is likely to prevail.  Indeed, the State has already introduced evidence tending to prove that the practices described in the Complaint have occurred.  *See* Ex. A (Lucero Decl.).

Defendants also claim that the State is not likely to prevail because it cannot demonstrate any alleged harm from uncontrolled emissions.  Relying on identical arguments regarding the validity of the IUR value established by the EPA, Defendants argue that the State's allegations concerning IRIS and NATA are unfounded based on Defendants' self-serving determination that the standard is wrong.  Opp. at 23.  As discussed, while Defendants may disagree with the established risk levels, they represent the best current science based on more than 10 years of review by the EPA, publication in peer-reviewed journals, and input and criticism from an array of interested parties, including the chemical industry.  Defendants' continued disagreement with

11

the science that has set the current values for establishing potential inhalation risk and harm to the public does not make it any less valid.[6]

## CONCLUSION

As set forth in the State's pending *Motion to Remand*, Dkt. 4, federal jurisdiction over this action is lacking. However, due to the urgency of the threat to public health posed by Defendants' conduct, the State submits this reply to expedite resolution of the Emergency Motion in the Third Judicial District Court, County of Doña Ana in the event the case is remanded, or in this Court, in the event that the case is not remanded. If this Court does retain jurisdiction of the case, the State respectfully submits that the Court should enjoin Defendants' ongoing conduct resulting in the uncontrolled emission of EtO into the ambient air in and around Santa Teresa, thereby reducing the substantial risk to the health and safety of those residents.

Dated: March 9, 2021                    Respectfully Submitted,

                                        ATTORNEY GENERAL OF NEW MEXICO
                                        HECTOR H. BALDERAS

                                        By:     */s/ Jacqueline Ortiz*
                                                P. Cholla Khoury
                                                Jacqueline Ortiz
                                                Assistant Attorneys General
                                                P.O. Drawer 1508

---

[6] Defendants also attack the IUR by pointing to scientific literature that criticizes the federal agency's conclusions. *See* Opp. at 23, n.25 (citing Exhibits N-P). At least one of the cited authorities, Exhibit O, was actually considered and rejected in the EPA Evaluation as **unreliable** because it "relies on small numbers of cases and a crude exposure assessment, with a high potential for exposure misclassification." *See* **Ex. G**, Excerpts of Full Version, Evaluation of the Inhalation Carcinogenicity of Ethylene Oxide, EPA at 3-5 (2017) (available in full at https://cfpub.epa.gov /ncea/iris/iris_documents /documents/toxreviews/1025tr.pdf). The other recent authorities that Defendants attach, Exhibits N and P, are suspect because they fail to include information showing that the reports were funded by the chemical industry, clearly demonstrating a bias. *See, e.g.*, **Ex. H**, Excerpts of David Egilman, *The Production of Corporate Research to Manufacture Doubt about the Health Hazards of Products*, New Solutions: A Journal of Environmental and Occupational Policy, 181-82 (2018) (criticizing firms such as Cardno Chemrisk (authors of the cited literature) for "developing policy arguments as part of a legal defense strategy and not as a scientific endeavor").

Santa Fe, New Mexico 87504-1508
ckhoury@nmag.gov
jortiz@nmag.gov
Tel.: (505) 717-3500
Fax: (505) 318-1050

Marcus J. Rael, Jr.
**ROBLES, RAEL & ANAYA**
500 Marquette Ave. NW
Suite 700
Albuquerque, New Mexico 87102
Tel: (505) 242-2228
Fax: (505) 242-1106
marcus@roblesrael.com

Kyle J. McGee (*Pro Hac Vice*)
Viola Vetter (*Pro Hac Vice*)
Jason H. Wilson (*Pro Hac Vice*)
**GRANT & EISENHOFER P.A.**
123 Justison St
Wilmington, DE 19801
Tel: (302) 622-7000
Fax: (302) 622-7100
kmcgee@gelaw.com
vvetter@gelaw.com
jwilson@gelaw.com

*Counsel for Plaintiff*

13

## <u>CERTIFICATE OF SERVICE</u>

I, hereby certify that on the 9th day of March 2021, the foregoing document was filed and

served electronically through the CM/ECF on all counsel of record.

HECTOR H. BALDERAS
ATTORNEY GENERAL OF NEW MEXICO

By:    */s/ Marcus J. Rael, Jr.*
       Marcus J. Rael, Jr.

14